# IN THE UNTED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

JANIS CLARO, as next friend and )
Guardian of Lisa C. Schaapveld, an )
incapacitated person, )
                                     )

       **Plaintiff,** )

                                      )

       **v.** )         **Case No. CIV-16-428-SPS**

                                      )

CITY OF SULPHUR; MURRAY )
COUNTY BOARD OF COUNTY )
COMMISSIONERS; OKLAHOMA )
DEPARTMENT OF PUBLIC SAFETY; )
JACK LAFOUNTAIN, in his individual )
capacity; JAY MCCLURE, in his )
individual capacity; VERONICA )
MEDINA, in her individual capacity; )
WILLIAM ODOM, in his individual )
capacity; and DAVID SHORES, in his )
supervisory capacity, )
                                      )

       **Defendants.** )

## ORDER

       This case arises out of an encounter between Lisa Schaapveld and officers with the

City of Sulphur Police Department, the Murray County Sheriff's Office, and the Oklahoma

Highway Patrol, among others. Due to a traumatic brain injury, Ms. Schaapveld has been

found to be incapacitated and her aunt, Janis Claro, has been appointed as her guardian.

The Plaintiff has named as Defendants the City of Sulphur, the Murray County Board of

County Commissioners (representing the Murray County Sheriff's Office), the Oklahoma

Department of Public Safety (representing the Oklahoma Highway Patrol), Jack

LaFountain in his individual capacity, Jay McClure in his individual capacity, Veronica Medina in her individual capacity, William Odom in his individual capacity, and David Shores in his supervisory capacity as Chief of the Sulphur Police Department. The Plaintiff has alleged claims pursuant to 42 U.S.C. § 1983, as well as claims under Oklahoma state law. For the reasons set forth below, the Court finds that Defendant Board's Motion and Brief for Summary Judgment [Docket No. 174]; Defendant Jay McClure's Motion and Brief for Summary Judgment [Docket No. 175]; Defendants City of Sulphur, David Shores, Jack LaFountain, Veronica Medina, and William Odoms' Motion for Summary Judgment and Brief in Support [Docket No. 179]; and Defendant Oklahoma Department of Public Safety's Motion for Summary Judgment and Brief in Support [Docket No. 183] should all be GRANTED.

## I. Procedural History

On October 10, 2017, Plaintiff filed the present case in this Court, alleging four causes of action against the various Defendants. The Plaintiff's first claim for relief is raised pursuant to Oklahoma state law as to the City of Sulphur, Murray County Board of County Commissioners, and the Oklahoma Department of Public Safety, as well as all of the individual officers, alleging negligence. The second claim for relief is raised pursuant to 42 U.S.C. § 1983 as to Defendants Medina, LaFountain, Odom, and McClure, alleging unconstitutional use of excessive and unreasonable force. The third claim for relief is raised pursuant to § 1983 as to the City of Sulphur and Murray County Board of County Commissioners, alleging constitutional violations related to failure to train and supervise. Finally, the Plaintiff raises a supervisory liability claim pursuant to § 1983 as to Defendant

Shores in his "supervisory" capacity, alleging constitutional violations related to failure to intervene and prevent the use of excessive force. The Court addresses these claims in turn.

## II. Law Applicable

Summary judgment is appropriate if the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The moving party must show the absence of a genuine issue of material fact, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), with the evidence taken in the light most favorable to the non-moving party, *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970). However, "a party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or . . . showing that the materials cited do not establish the absence or presence of a genuine dispute[.]" Fed. R. Civ. P. 56(c).

## III. Factual Background

The undisputed facts reflect that Lisa Schaapveld lived in Sulphur, Oklahoma, and owned a dog grooming business called Supermutts. On January 30, 2015, Ms. Schaapveld was admitted to Mental Health Services of Southern Oklahoma in Ardmore, Oklahoma, with reports of suicidal thoughts, severe depression, paranoia, and hallucinations. She was discharged on February 2, 2015. Ms. Schaapveld was having a domestic argument with her partner, Angie Seeley, sometime on February 9, 2015. Ms. Seeley lost contact with Ms. Schaapveld and went to Supermutts to try to locate her, noting that Ms. Schaapveld's

vehicle was parked in front of the shop. Still unable to make contact with Ms. Schaapveld, Ms. Seeley approached Oklahoma Highway Patrol Trooper Tracey Laxton and asked him for help with Ms. Schaapveld. He and two other officers knocked on the door of the shop, and Ms. Schaapveld came within their view and told them she wanted to be left alone. Seeing no immediate cause for concern at that time, the officers left the store.

Shortly thereafter, a 911 dispatcher answered a call at 2:56 p.m. that someone was inside the Supermutts with a gun. The first officer on the scene saw Ms. Schaapveld acting strangely and that she would not respond to him or open the locked door. He then went to the pawn shop located next door, where a man said he saw a woman with a gun who had said something about suicide. The officer then returned to Supermutts with another officer, at which time they observed Ms. Schaapveld with a revolver in her hand. They asked her to put the gun down, but she refused and made further suicidal statements, including that she was only coming out in a body bag.

As this situation developed, other law enforcement agencies also responded to the scene to assist the Sulphur Police Department ("SPD"), including the Murray County Sheriff's Office ("MCSO"), the Oklahoma Highway Patrol ("OHP"), and, apparently, rangers from the National Park Service. All the responding officers worked together to set up a perimeter to keep civilians out of the area. SPD Officer Medina, one of the named Defendants, approached the building and began engaging Ms. Schaapveld with Captain Lafountain, also a named Defendant, who served as her assistant. Defendant Medina and Ms. Schaapveld spoke off and on for two hours, and Defendant Medina even arranged the delivery of a hamburger to Ms. Schaapveld during this time. Other officers, including

Defendant Odom, another SPD officer, took a position on the other side of the building. Ms. Schaapveld was holding the gun the entire time, although it is disputed as to whether she "waived it around" or aimed it at anyone aside from herself.

SPD Chief David Shores later arrived at the scene and took control as the officer in charge. Around 5:00 p.m., he approached Ms. Schaapveld and demanded that she put the gun down and come out, causing her to become agitated and leave the front of the store and the view of the officers. Upon returning to the front of the store, she refused to speak with Defendant Medina anymore, but eventually began a dialogue with OHP Trooper Laxton.[1] As part of their conversations, Ms. Schaapveld conveyed that she would come out if methamphetamine was provided.

At some point after dark fell, Ms. Schaapveld turned off the lights in the front of the store and went to the rear of the store out of view of the officers, but returned to the front about thirty minutes later, turned on the lights, and began hanging a curtain or sheet to cover the north window in the store. This was the window through which Ms. Schaapveld had been communicating with various officers. She placed the gun down in order to cover the window, although it is disputed as to whether the gun was placed at her feet, or approximately ten feet away. While doing this, Trooper Laxton asked her to not cover up the window. Chief Shores, believing Ms. Schaapveld had been separated from the gun, ordered the SPD Special Response Team ("SRT") to breach the door and secure the gun. The SRT, led by SPD Officer Jason Conyer attempted to use a t-post driver to break the

---

[1] Trooper Laxton was originally named a Defendant in this case but has since been dismissed. *See* Docket No. 45.

door open three times, but was unsuccessful. While Officer Conyer unsuccessfully attempted to break the door down, Trooper Laxton attempted to distract Ms. Schaapveld from the officers trying to break the door down by breaking the north window. Defendant McClure, an MCSO Deputy, was standing near Trooper Laxton and the broken north window, and reached inside to move the curtain. Upon moving the curtain, Defendant McClure saw Ms. Schaapveld with the gun again in her hand, shot her while backing away (and presumably allowing the curtain to fall back into place), then moved the curtain again to see Ms. Schaapveld turning in the direction of officers positioned as the south window of the store. He fired a second and third time as he saw her turning toward the officers then back toward him. Plaintiff disputes whether Ms. Schaapveld was pointing the gun at the officers during this time, contending she was holding the gun in her hand not in a threatening manner but like a "scared little kid," but it is undisputed that the gun remained in her hand.

While Defendant McClure was in position and shooting through the north window, Defendants Medina, LaFountain, and Odom had moved to the south window to see what was happening. All three fired their weapons through the south window, shattering it. Ms. Schaapveld was hit by bullets seven times, and twelve casings were recovered at the scene – four from Defendant McClure's service weapon and eight from the service weapons of Defendants Medina, Lafountain, and Odom. An OSBI investigation determined that Ms. Schappveld's gun contained eight bullets which had not been fired, and each round had at least one firing pin strike on it although testing found the gun operable and capable of firing. Ms. Schaapveld sustained seven different injuries as a result of the gunshots from

the officers, including one gunshot to the forehead which caused a traumatic brain injury. Due to the traumatic brain injury, Ms. Schaapveld's aunt, Janis Claro, was appointed her legal guardian and has been named the Plaintiff in this case. Officer Conyer and Trooper Laxton were also struck by bullets or bullet fragments that were determined to be ricocheted bullets from other officers' guns, and were treated and released that evening.

## Analysis

**Negligence under the OGTCA (All Defendants).** The Plaintiff alleges in her Complaint that law enforcement officers from the City of Sulphur (the Sulphur Police Department), the Oklahoma Department of Public Safety (Oklahoma Highway Patrol ("OHP"), and the Murray County Sheriff's Office, who were all acting within the scope of their authority and under color of law, owed Ms. Schaapveld a duty of reasonable care, which was breached by their actions on February 9, 2015, resulting in negligence and recklessness. All Defendants contend that they are immune from suit under the Oklahoma Governmental Tort Claims Act ("OGTCA"), and that even if they are not entitled to immunity, their actions were objectively reasonable, which is the required standard of care. Under the OGTCA, "[i]n no instance shall an employee of the state or political subdivision acting within the scope of his [or her] employment be named as defendant with the exception that suits based on the conduct of resident physicians and interns[.]" 51 Okla. Stat. § 163(C). As Plaintiff's Complaint alleges that each individual defendant was acting within the scope of their employment, *see* Docket No. 2, pp. 2-3, 13, ¶¶ 7-12, 85, each of the individual defendants are entitled to summary judgment on this claim. *See Burns v. Holcombe*, 2010 WL 2756954, at *11 (E.D. Okla. July 12, 2010) ("In light of the Plaintiff's

admission these individual Defendants were acting within the scope of their employment, the clear language of the GTCA and recent case law evidencing the immunity from suit provided to individual employees of a government agency or political subdivision acting within the scope of his/her employment, this Court finds Defendants [] are entitled to summary judgment on the tort claim[ of] negligence."). *See also Shephard v. CompSource Oklahoma*, 2009 OK 25, ¶ 20, 209 P.3d 288, 294 ("The Legislature has provided immunity for the state employees acting within the scope of their employment.").

As to the governmental Defendants, under Oklahoma law, "the GTCA is the exclusive remedy for an injured plaintiff to recover against a governmental entity in tort. Subject only to the GTCA's specific limitations and exceptions, governmental immunity is waived under the GTCA." *Tuffy's, Inc. v. City of Oklahoma City*, 2009 OK 4, ¶ 7, 212 P.3d 1158, 1163. Furthermore, "[t]he doctrine of *respondeat superior* is applicable under the GTCA. Under the theory of *respondeat superior*, one acts within the scope of employment if engaged in work assigned, or if doing that which is proper, necessary and usual to accomplish the work assigned, or doing that which is customary within the particular trade or business." *Id. See also Ice v. Oklahoma ex rel. Oklahoma Dep't of Consumer Credit*, 2017 WL 2351008, at *2 (W.D. Okla. May 30, 2017) ("The GTCA *authorizes* suit against the State or its departments based on conduct of employees 'acting within the scope of their employment,' that is, 'in good faith within the duties of the employee's office or employment.'") (emphasis added), *quoting* 51 Okla. Stat. §§ 152(12) & 153(A). The Oklahoma Supreme Court reminds litigants that, "We have consistently held that a municipality is liable for the tortious acts of police officers committed within

the scope of employment as defined by the GTCA." *Tuffy's*, 2009 OK ¶ 20, 212 P.3d at 1167.

"In order to state a claim for negligence, a litigant must show the existence of a duty on the part of the defendant to protect plaintiff from injury, a breach of the duty, and an injury to plaintiff proximately resulting from the breach." *Id.* at ¶ 21, 212 P.3d at 1167. In the special category of police officers making an arrest, the standard of care is that he is required "to use only such force in making an arrest as a reasonably prudent police officer would use in light of the objective circumstances confronting the officer at the time of the arrest." *Morales v. City of Oklahoma City ex rel. Oklahoma City Police Dept.*, 2010 OK 9, ¶ 26, 230 P.3d 869, 880. As relevant to this case, "[u]nder circumstances where a law enforcement officer has allegedly used excessive force while attempting to take custody of an armed, suicidal individual, the Tenth Circuit has held that [51 Okla. Stat.] § 155(6) immunizes the political subdivision from liability." *Hodge v. Keene*, 2013 WL 372460, at *10 (W.D. Okla. Jan. 30, 2013), *citing Myers v. Oklahoma County Bd. of County Commissioners*, 151 F.3d 1313, 1321 (10th Cir. 1998) ("In this case [] we are concerned with an act committed by law enforcement personnel while attempting to take an individual – Mr. Myers – into protective custody. . . . [E]ven if the officers had committed the alleged torts, the County would be immune[.]"), *and Samuel v. City of Broken Arrow*, 506 Fed. Appx. 751, 756 (10th Cir. 2012) ("Garrett was seeking to protect the Samuels and the bystanders, including 'to protect [Nathan Samuel] from harming [him]self or others' rather than attempting to arrest him or otherwise carry out a law enforcement function. Because Garrett's use of force was '[]related to the method of providing police protection to the

public' rather than to a law enforcement activity such as arresting a suspect, we conclude that the City is entitled to immunity from tort liability under §155(6)."), *citing, inter alia*, *Schmidt v. Grady County, Okla.*, 1997 OK 92, ¶¶ 2, 15, 943 P.2d 595, 596, 598. Accordingly, the political subdivisions named in this case—The City of Sulphur, the Murry County Board of County Commissioners, and the Oklahoma Department of Public Safety—are likewise entitled to immunity under the OGTCA.

**Excessive force pursuant to 42 U.S.C. § 1983 (Medina, LaFountain, Odom, and McClure).** Next, the Plaintiff has alleged a § 1983 claim of excessive force against Defendants McClure, Medina, Odom, and LaFountain. Each Defendant has asserted a defense of qualified immunity, and that they did not act with excessive or unreasonable force.

*Failure to Intervene.* Before continuing, the Court notes that Plaintiff's responses raise for the first time the allegation that, not only did these individual Defendants engage in excessive and unreasonable force, but that they also are liable for failing to intervene. Specifically, the Plaintiff asserts that Defendants Medina, Odom, and LaFountain are liable for failing to intervene as to Defendant Chief Shores, and that Defendant McClure is liable for failing to intervene as to Defendants Shores, Medina, Odom, and LaFountain.

"A plaintiff does not have to separately plead a failure to intervene cause of action, but the pleadings must 'make clear the grounds on which the plaintiff is entitled to relief.'" *Lynch v. Board of County Commissioners of Muskogee County, Oklahoma*, __ Fed. Appx. __, 2019 WL 4233382, at *5 (10th Cir. Sept. 6, 2019) (slip op.), *citing Fogarty v. Gallegos*, 523 F.3d 1147, 1164 (10th Cir. 2008). Here the plaintiff's Complaint did not meet this low

bar.  The Court further notes, however, that in the Tenth Circuit, "new allegations in a response to a motion for summary judgment" are interpreted "as a potential request to amend the complaint" pursuant to Fed. R. Civ. P. 15.  *Martinez v. Potter*, 347 F.3d 1208, 1211 (10th Cir. 2003).  This is based on the principle that a "plaintiff should not be prevented from pursuing a claim simply because of a failure to set forth in the complaint a theory on which the plaintiff could recover, *provided that a late shift in the thrust of the case will not prejudice the other party in maintaining its defense*."  *Green Country Food Market, Inc. v. Bottling Group, LLC*, 371 F.3d 1275, 1279 (10th Cir. 2004) (emphasis added).  Thus, amendment of the Complaint *is contemplated* at the summary judgment stage, but generally only in conjunction with a formal request to amend and a proposed Amended Complaint.  *See Martinez*, 347 F.3d at 1212 ("If an amendment is permitted, we think the federal rules contemplate a formal amended complaint, an amended answer and inclusion of the issue in the initial pretrial report and the pretrial order.  Corroborative of our conclusion that the complaint was not amended is that Plaintiff never moved to amend, and no amended complaint was filed.").

Here, Plaintiff's responses to Defendants' summary judgment motions included no such request – formal or otherwise – nor has she filed a motion to amend or an amended Complaint.  Further, the Court finds that such amendment would be untimely, and that Plaintiff has failed to offer any explanation as to why such a claim was not raised until her response to the summary judgment motions.  *Ceja v. Myers International Midways, Inc.*, 2016 WL 6459802, at *3 (N.D. Okla. Oct. 31, 2016) ("This type of request to amend the complaint is considered under Fed. R. Civ. P. 15 and may be denied for untimeliness.  A

11

court may consider whether the Defendant will be denied the opportunity to conduct discovery on a new claim if a request to amend the complaint is asserted in response to a motion for summary judgment. A party's failure to offer a reasonable explanation for raising a new claim in response to a motion for summary judgment is also a factor weighing against allowing such an amendment.") (internal citations omitted). *See also Fuqua v. Lindsay Management Co., Inc.*, 321 Fed. Appx. 732, 735 (10th Cir. 2009) ("[W]e find no abuse of discretion in the district court's failure to permit the Fuquas to amend their petition because they did not provide the district court with adequate notice that they wanted to do so. The Fuquas never sought leave to file an amended complaint, they never asked that their response to summary judgment be treated as a request to amend, and they never filed an amended complaint."), *citing Martinez*, 347 F.3d at 1212; *Spencer v. Wal-Mart Stores, Inc.*, 203 Fed. Appx. 193, 195 n.2 (10th Cir. 2006) ("Spencers first articulated this theory in their response to Wal-Mart's motion for summary judgment. . . . Raising a claim in a response to a summary judgment motion does not properly present a claim to the district court for review, and accordingly the district court did not err in ignoring this claim in its order.").

Even if the Court were to consider Plaintiff's untimely failure to intervene claims, the Court finds that such claims would fail. In the Tenth Circuit, "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official." *Vondrak v. City of Las Cruces*, 535 F.3d 1198,

1210 (10th Cir. 2008), *quoting Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). Thus, "[i]n order to be liable for failure to intervene, the officers must have 'observe[d] or ha[d] reason to know' of a constitutional violation and have had a 'realistic opportunity to intervene.'" *Jones v. Norton*, 809 F.3d 564, 576 (10th Cir. 2015), *quoting Vondrak*, 535 F.3d at 1210. Because the Court finds, for the reasons stated below, that there was no underlying constitutional violation, *e. g.*, excessive force, Plaintiff's failure-to-intervene claim would therefore fail even if it had been properly raised.

*Excessive force.* The Court thus returns to whether these four Defendants are entitled to qualified immunity on Plaintiff's second claim for relief, excessive force. "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right *and* (2) the constitutional right was clearly established. The court may consider either of these prongs before the other 'in light of the circumstances in the particular case at hand.'" *Cunningham v. New Mexico*, 2014 WL 12791236, at *4 (D. N.M. 2014) (emphasis added), *quoting Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009), *and Pearson v. Callahan*, 555 U.S. 223, 236 (2009). And "immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *White v. Pauly*, _ U.S. _, 137 S. Ct. 548, 551 (2017), *quoting Mullenix v. Luna*, _ U.S. _, 136 S. Ct. 305, 308 (2015). "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Rojas v. Anderson*, 727 F.3d 1000, 1003 (10th Cir. 2013) (internal quotation marks omitted).

"To state an excessive force claim 'under the Fourth Amendment, plaintiffs must show *both* that a 'seizure' occurred and that the seizure was 'unreasonable.'" *Thomas v. Durastanti*, 607 F.3d 655, 663 (10th Cir. 2010) (emphasis in original), *quoting Childress v. City of Arapaho*, 210 F.3d 1154, 1156 (10th Cir. 2000). Here, "there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). *See also Brooks v. Gaenzle*, 614 F.3d 1213, 1219 (10th Cir. 2010) ("[A] 'seizure' requires restraint of one's freedom of movement and includes apprehension or capture by deadly force."). It remains, however, for the Plaintiff to demonstrate that the actions of each of these Defendants was unreasonable.

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). And it is an objective inquiry: "the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397 (internal quotations omitted). And an officer does not have to use the least intrusive means, as long as his conduct was reasonable. *Thomas*, 607 F.3d at 670. Furthermore, reasonableness is based on a totality of the circumstances. *Garner*, 471 U.S. at 8-9. Thus, "[r]easonableness" does not have a precise test but rather "requires careful attention to the facts and circumstances of each particular case." *Graham*, 490 U.S. at 396. Helpfully, the Supreme Court in *Graham* set out several important factors to consider, including "the severity of the crime at issue, whether the suspect poses an immediate threat

to the safety of the officers or others, and whether [s]he is actively resisting arrest or attempting to evade arrest by flight." *Id.* Also, "[t]he reasonableness of Defendants' actions depends both on whether the officers were in danger at the *precise moment* that they used force and on whether Defendants' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." *Sevier v. City of Lawrence, Kan.*, 60 F.3d 695, 699 (10th Cir. 1995) (emphasis added). *See also Allen v. Muskogee, Okla.*, 119 F.3d 837, at 840 (10th Cir. 1997) ("We will thus consider an officer's conduct prior to the suspect's threat of force if the conduct is 'immediately connected' to the suspect's threat of force."), *quoting, inter alia, Romero v. Board of County Commissioners of County of Lake, State of Colo.*, 60 F.3d 702, 705 n.5 (10th Cir. 1995). The Court cautions, however, that "the only factors that can reasonably be considered are those known to the officers prior to making the disputed decision[.]" *Phillips v. James*, 422 F.3d 1075, 1081 (10th Cir. 2005).

The Court finds that the first *Graham* factor, the severity of the crime, bears some discussion. On one hand, it weighs heavily in favor of Ms. Schaapveld because the Defendants were not investigating a crime at all, but rather conducting a requested welfare check. *See Perea v. Baca*, 817 F.3d 1198, 1202 (10th Cir. 2016) ("That the officers were performing a welfare check, and that they were not looking for him because they suspected he had committed a crime prior to finding him, weighs heavily against the use of significant force."). *See also Fogarty*, 523 F.3d at 1160 (the amount of force should be reduced in proportion to the severity of the crime). And "an individual's mental health is another 'one of the facts and circumstances' that 'a reasonable officer on the scene' would ascertain.'"

*French v. City of Cortez*, 361 F. Supp. 3d 1011, 1036 (D. Colo. 2019), *quoting Estate of Armstrong v. Village of Pinehurst*, 810 F.3d 892, 900 (4th Cir. 2016), *quoting Graham*, 490 U.S. at 396. The Eleventh Circuit has even noted that where a "situation does not involved a criminal arrest, our facts do not fit neatly within the *Graham* framework[,]" and "it is impossible for this court to measure the 'severity of the crime at issue.'" *Mercado v. City of Orlando*, 407 F.3d 1152, 1157 (11th Cir. 2005). However, upon approaching Ms. Schaapveld as part of this welfare check, the officers became aware that she had a gun and there is testimony that she pointed it at least at herself, if not also at various officers. *See Estate of Larsen*, 511 F.3d 1255, 1260 (10th Cir. 2008) ("[E]ven if an officer reasonably, but mistakenly, believed that a suspect was likely to fight back . . . the officer would be justified in using more force than in fact was needed.") (internal quotations omitted). In contrast, the third *Graham* factor—whether the suspect is actively resisting arrest—is easily weighed in favor of the Defendants because Ms. Schaapveld had locked herself inside the store for hours with a loaded gun, refusing to come out.

The second factor—the immediacy of the harm—requires the closest analysis and "is undoubtedly the 'most important' and fact intensive factor in determining the objective reasonableness of an officer's use of force." *Pauly v. White*, 874 F.3d 1197, 1216 (10th Cir. 2017), *quoting Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010). This factor is analyzed "at the precise moment that the officer used force." *Estate of Ronquillo by and through Estate of Sanchez v. City and County of Denver*, 720 Fed. Appx. 434, 438 (10th Cir. 2017). To be clear, *deadly force* is "only justified if the officer had probable cause to believe that there was a *threat of serious physical harm to [himself] or others.*" *Pauly*, 874

F.3d at 1216 (emphasis in original), *quoting Estate of Larsen*, 511 F.3d at 1260.  And to clarify, "if threatened by weapon[], an officer may use deadly force."  *Thomas*, 607 F.3d at 664 ("We must consider whether Agent Durastanti could have reasonably perceived he was in danger at the precise moment that he used force and whether his own reckless or deliberate conduct (as opposed to mere negligence) unreasonably created the need to use force.").

To evaluate the degree of threat, then, the Court looks to the four-factor test set forth in *Estate of Larsen*:  "(1) whether the officers ordered the suspect to drop h[er] weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect."  511 F.3d at 1260.  *See also Cordova v. Aragon*, 569 F.3d 1183, 1188 (10th Cir. 2009) ("There is no easy-to-apply legal test for whether an officer's use of deadly force is excessive; instead, we must 'slosh our way through the fact-bound morass of 'reasonableness.''"), *quoting Scott v. Harris*, 550 U.S. 372, 383 (2007).  "The court conducts this analysis from the perspective of a reasonable officer on the scene, rather than with the vision of 20/20 hindsight, acknowledging that the officer may be forced to make split-second judgments in certain difficult circumstances."  *Estate of Ronquillo by and through Estate of Sanchez v. City and County of Denver*, 2016 WL 10843787, at *3 (D. Colo. Nov. 17, 2016).

Here, Ms. Schaapveld was repeatedly asked and told to put down her weapon, and asked to comply with police commands and requests to come out of the store.  It is true for purposes of summary judgment that the Defendants did not instruct her to put down her

weapon immediately before they began shooting, but officers at the scene had instructed her and asked her to do so several times in the hours leading up to the shooting. *Garner*, 471 U.S. at 1-121 ("Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction of threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, *where feasible, some warning has been given*.") (emphasis added).

With regard to any hostile motions Ms. Schaapveld may have made toward the officers, Ms. Schaapveld had on more than one occasion pointed the gun at herself and had refused to put it down for hours, only putting it down for a brief time as she hung up the curtain. Moreover, although what she did with the gun is disputed, *i. e.*, whether she held it in her hand like a "scared little kid" or waived it around in a threatening manner aiming it alternately at herself and the officers, it is undisputed that she refused to put it down, creating a dangerous situation for the officers involved. Additionally, she was in some relative proximity to the officers, although at all times (until the building was breached after the shooting) separated by windows and walls. And even after hours of negotiations and conversations, Ms. Schaapveld's intentions were unclear and of escalating concern given the firearm in her possession, her repeated suicidal statements, and her attempts to create further distance from the offices by hanging up the curtain. This created "a tense,

uncertain, and rapidly evolving situation that we do not like to second-guess using the 20/20 hindsight found in the comfort of a judge's chambers." *Phillips*, 422 F.3d at 1084.

The Court is not persuaded by Plaintiff's argument that Ms. Schaapveld posed no threat at the time she was shot because the gun was not pointed at the officers, because such argument does not take into account the rapidly-evolving situation as the other officers attempted entry of Supermutts. *See Phillips*, 422 F.3d at 1083 ("[A]lthough the precise moment before Sgt. Adamson shot is a critical factor, the events leading up to that moment are also extremely relevant."). *See also Wood v. Farmington City*, 910 F. Supp. 2d 1315, 1326 (D. Utah 2012) ("Whether Mr. Wood had a gun in his hand when he was shot does not determine whether Mr. Wood posed an immediate threat to the safety of the officers when he was shot."). "[E]ven if an officer reasonably, but mistakenly, believed that a suspect was likely to fight back . . . the officer would be justified in using more force than in fact was needed." *Estate of Larsen*, 511 F.3d at 1260. Given the totality of circumstances, the evidence even in the light most favorable to the Plaintiff supports the officers' use of deadly force "at the precise moment that [they] used force." *Estate of Ronquillo*, 720 Fed. Appx. at 438. *See, e. g*., *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1318 (10th Cir. 2009) ("The central episode—that involved only a matter of seconds during which the undisputed evidence indicates that Mr. Thomson was moving his gun up and down quickly, including aiming it directly at the officers at one point—is exactly the type of 'tense, uncertain, and rapidly evolving situation that we do not like to second-guess using the 20/20 hindsight found in the comfort of a judge's chambers.'"), *quoting Phillips*, 422 F.3d at 1084.

The plaintiff nevertheless contends that Defendant Shores' order to enter the building unnecessarily created the need to use deadly force and was an event that must be considered leading up to the moment Officers McClure, Medina, LaFountain, and Odom began shooting. The Court does not weigh in on the wisdom of Defendant Shores' decision to order the entry at the time that he did. But the Court finds that decision ultimately irrelevant as to the independent decisions by Defendants McClure, Medina, LaFountain, and Odom to use deadly force as to Ms. Schaapveld. *See Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1192 (10th Cir. 2001) ("[T]he facts alleged by plaintiffs-appellees nevertheless do not show that by itself, the display of force inherent in the deployment of the SWAT team—the force invoked by the *decision* to deploy—was excessive under Fourth Amendment standards.") (emphasis in original). *See also Cruz v. City of New Rochelle*, 2017 WL 1402122, at *25 (S.D.N.Y. April 3, 2017) ("Although Plaintiffs contend that the use of lethal force resulted from the officers' erroneous decision to employ Tasers, which they should have known would be ineffective in subduing Cruz, '[the officers'] actions leading up to the shooting are irrelevant to the objective reasonableness of [Officer Geertgen's] conduct at the moment he decided to employ deadly force. The reasonableness inquiry depends only upon the officer's knowledge of circumstances immediately prior to and at the moment that he [or she] made the split-second decision to employ deadly force.'"), *quoting Salim v. Proulx*, 93 F.3d 86, 92 (2d Cir. 1996).

The Plaintiff further contends that the officers were not justified in continuing to shoot after she was down, and that there was evidence she was shot through her foot and

the underside of a breast. However, the speed at which the events unfolded prevented an extended period of reflection or evaluation and there is no evidence (disputed or otherwise) that there was a pause in the shooting that was then resumed after Ms. Schaapveld was on the ground. The undisputed facts reflect that the officers shot at Ms. Schaapveld through the window, she fell on the ground, and Deputy Flowers approached her to move the gun. *See Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014) ("It stands to reason that, if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended."). *See also Cordova*, 569 F.3d at 1196 (O'Brien, J., concurring in part and dissenting in part) ("[A]n officer cannot be expected to shoot, pause to evaluate the effect, and then calmly decide whether it is necessary or prudent to shoot again. That is a lot to do in one second under extreme conditions. The only question we need to address is whether, in the instant it was made, Aragon's decision to use deadly force was reasonable.").

The totality of the circumstances analysis is further bolstered by the fact that four different officers on the scene at that moment made independent decisions to use lethal force against Ms. Schaapveld because they perceived an immediate threat. *See Wood*, 910 F. Supp. 2d at 1326-1327 (D. Utah 2012) ("It is uncontested that three separate officers at the scene, each assigned as an advanced observer marksman, made an independent decision to take lethal force against Mr. Wood at the same time that Deputy Boucher shot Mr. Wood because of their perceptions of an immediate threat. This supports the determination that Deputy Boucher's use of deadly force was objectively reasonable and justified."). *See also Norton v. City of S. Portland*, 831 F. Supp. 2d 340, 363 (D. Me. 2011) ("Notably, Officer

Sutton's decision to fire his bean bag shotgun at the same moment indicates that Sutton has similarly concluded that Norton was close enough to justify the use of lethal force), *citing Lopera v. Town of Coventry,* 640 F.3d 388, 396 (1st Cir. 2011) ("[I]mmunity will issue when officers of reasonable competence could disagree . . ., but it will not issue if it is obvious that no reasonably competent officer would have concluded that the action was lawful."). Moreover, the Court finds that these four Defendants had probable cause to believe that Ms. Schaapveld posed a threat of serious physical harm to the officers at the scene and were justified in their use of force. *Johnson v. City of Roswell*, 2017 WL 4083568, at *9 (D. N.M. Sept. 13, 2017) ("Based on the summary judgment record, Defendant Lannoye had probable cause to believe that Plaintiff posed a threat of serious physical harm to the officers at the scene. As such, he was justified in using deadly force against Plaintiff. None of the officers at the scene recklessly or deliberately created the need for such force by their pre-shooting conduct.").

Based on the *Larsen* factors in conjunction with the *Graham* factors, and "from the perspective of a reasonable officer on the scene, [the Court finds that] the totality of circumstances," *Thomson*, 584 F.3d at 1319, justified the actions of Defendants Medina, LaFountain, Odom, and McClure, and that their actions were objectively reasonable.

But even assuming *arguendo* that the officers' actions were objectively unreasonable, the Plaintiff must also establish that Defendants' actions violated a clearly established constitutional right. "Ordinarily, a plaintiff may show that a particular right was clearly established at the time of the challenged conduct 'by identifying an on-point Supreme Court or published Tenth Circuit decision; alternatively, 'the clearly established

weight of authority from other courts must have found the law to be as he maintains.'" *A.M. v. Holmes*, 830 F.3d 1123, 1135 (10th Cir. 2016), *quoting Quinn v. Young*, 780 F.3d 998, 1005 (10th Cir. 2015). However, "'clearly established law' should not be defined 'at a high level of generality.'" *White*, 137 S. Ct. at 552, *quoting Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). Instead, it "must be 'particularized' to the facts of the case. Otherwise, plaintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.*, *quoting Anderson v. Creighton*, 483 U.S. 635, 639-640 (1987).

Here, Plaintiff asserts that Tenth Circuit law clearly establishes that "an officer acts unreasonably when he aggressively confronts an armed and suicidal/emotionally disturbed individual without gaining additional information or by approaching him in a threatening manner (*i.e.*, running and screaming at him)." *Hasting v. Barnes*, 252 Fed. Appx. 197, 206 (10th Cir. 2007), *citing Allen*, 119 F.3d 837, and *Sevier v. City of Lawrence, Kan.*, 60 F.3d 695 (10th Cir. 1995). In *Hastings*, officers were noted for their failure to de-escalate the situation with "an individual who was potentially mentally ill or emotionally disturbed" by *immediately* "entering the home, confronting [the individual] in his bedroom doorway, and pepper-spraying him, to the point deadly force was required." *Id.* at 201. This decision relied heavily upon the *Allen* and *Sevier* decisions, cited above. In *Allen*, the Tenth Circuit reversed a grant of summary judgment, finding there was a genuine issue of material fact as to whether the officers had been reckless and precipitated the need to use deadly force when one of the officers "ran 'screaming' up to Mr. Allen's car and immediately began shouting at Mr. Allen to get out of his car; other testimony indicates that Lt. Smith

approached cautiously and tried talking Mr. Allen into giving up the gun." *Allen*, 119 F.3d at 840-841. In *Sevier*, the Tenth Circuit found it lacked jurisdiction over a district court's denial of summary judgment based on qualified immunity because genuine issues of material fact remained, including how the officers confronted the decedent in that case. *Sevier*, 60 F.3d 695, 700-701 & n. 10 (10th Cir. 1995). Plaintiff also cites to *Estate of Ceballos v. Husk*, 919 F.3d 1204 (10th Cir. 2019), in which the Tenth Circuit, relying on *Allen*, found that the officer was on notice that his conduct in approaching and shooting Mr. Ceballos was unconstitutional where the officer "shot and killed an emotionally distraught Ceballos within a minute of arriving on scene." *Ceballos*, 919 F.3d at 1216 (also noting that "[n]either *Sevier*, decided on jurisdictional grounds, nor the unpublished decision in *Hastings*, by themselves created the clearly established law that would have put an objective officer in Husk's position that his conduct in approaching and shooting Ceballos was unconstitutional. But *Sevier* and *Hastings* strengthen our conclusion that, in light of *Allen* a reasonable officer in Husk's position would have known that his conduct (viewed in the light most favorable to Ceballos) violated his Fourth Amendment right to be free from excessive force."). The Plaintiff has pointed to no Supreme Court or Tenth Circuit law, however, prohibiting the use of deadly force when confronting an armed, mentally disturbed individual after negotiations have broken down. *See Perry v. Durborow*, 892 F.3d 1116, 1123 (10th Cir. 2018) ("Perry must identify a case where an official acting under similar circumstances as [Defendant] was held to have violated the Constitution.") (internal quotations omitted), *citing Pauly*, 137 S. Ct. at 552. The Plaintiff contends that the time frame in those cases in "not a meaningful distinction," because there

was no reason for the officers to attempt an entry at the time that they did, and therefore all four officers violated clearly established law. The Court disagrees, finding that the immediacy of the actions in *Allen, Sevier, Hastings,* and *Ceballos* are readily distinguishable from this case, where officers proceeded to discharge their weapons hours into a standoff where a breach of the building had failed and they were confronted with a volatile, armed individual with potentially deteriorating mental health.

Furthermore, this Court has already expressed concern that the law advocated by Plaintiff was not "clearly established," if at all, until the March 2019 *Ceballos* decision was issued. *See Burke v. City of Tahlequah, Oklahoma*, 2019 WL 4674316, at *5 (E.D. Okla. Sept. 25, 2019). Judge Bacharach stated in his dissent in *Ceballos*, "Nor did *Allen* clearly establish a constitutional violation from Officer Husk's conduct." *Ceballos*, 919 F.3d at 1227. In *Burke*, then, this Court noted that because the *Ceballos* decision was not unanimous, even then "the 'clearly established law' hurdle has [likely] not been cleared." *Id.*, *citing Van De Weghe v. Chambers*, 569 Fed. Appx. 617, 620 (10th Cir. 2014) ("In these circumstances—without a binding opinion from the Supreme Court, with uncertain signals in this court, and with other courts unmistakably divided—it becomes difficult to conjure how Mr. Van De Weghe might have cleared the 'clearly established law' hurdle even if he had tried."). The Court therefore finds that the law is not clearly established in this case and that Defendants McClure, Medina, Odom, and LaFountain are thus entitled to qualified immunity.

**Inadequate Training, Supervision, and Discipline pursuant to 42 U.S.C. § 1983 (City of Sulphur and Murray County Sheriff's Office).** Next, the Plaintiff has alleged

a claim of failure to train and supervise officers on the subject of excessive force, in violation of the Fourth Amendment, pursuant to § 1983, as to the City of Sulphur, a.k.a., the SPD, as well as the Murray County Board of County Commissioners ("the Board"), for the MCSO.

The Board first asserts that it is a not a properly named party in this case, and that the Sheriff of Murray County in his official capacity is instead the proper party. Generally, "a party's capacity to sue or be sued is determined 'by the law of the state where the court is located.'" *Ratzlaff v. Board of County Commissioners of Caddo County, Oklahoma*, 2019 WL 544952, at *3 (W.D. Okla. Feb. 11, 2019). Under Oklahoma law for all suits against a county, "the name in which a county shall sue or be sued shall be, 'Board of County Commissioners of the County of _____[.]'" 19 Okla. Stat. § 4. And naming an official in his official capacity "is the same as bringing suit against the county." *Beggs*, 563 F.3d at 1091. As a result, a number of decisions by "other federal district judges in Oklahoma have determined that suing the board of county commissioners of an Oklahoma county is the proper means to bring a § 1983 suit against the county if a plausible claim of county liability is stated." *Ratzlaff*, 2019 WL 544952, at *4 (collecting cases). This is supported in a Tenth Circuit decision which states that "[t]he County may also be liable on the basis that [the Sheriff] is a final policymaker with regard to its jail, such that his actions may fairly be said to be those of the municipality." *Layton v. Board of County Commissioners of Oklahoma County*, 512 Fed. Appx. 861, 871 (10th Cir. 2013) (internal quotations omitted). Accordingly, the Court finds that the Board is a properly-named party for the Plaintiff's third claim for relief.

26

Here, the Plaintiff asserts that the officers from the SPD and the MCSO were not properly trained or supervised "in dealing with a barricaded person suffering from mental illnesses," and that absent such failure, a violation of her Fourth Amendment right to be free of unreasonable seizures would not have been violated. Docket No. 2, p. 17, ¶¶ 98-101. This type of claim "requires the plaintiff [to] prove (1) the entity executed a policy or custom (2) that caused the plaintiff to suffer deprivation of constitutional or other federal rights." *Cox v. Glanz*, 800 F.3d 1231, 1255 (10th Cir. 2015) (internal quotations omitted). "Thus, a municipal entity may be held liable only for an act it officially sanctioned or for the actions of an official with policymaking authority. An official policy can be shown through an official decision or statement or through 'the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law.'" *Goss v. Board of County Commissioners of Creek County*, 645 Fed. Appx. 785, 789 (10th Cir. 2016), *quoting City of St. Louis v. Praprotnik*, 485 U.S. 112, 122-123, 127 (1988). *See also Yarbrough v. City of Kingfisher*, 153 F.3d 730, 1998 WL 427122, at *3 (10th Cir. July 14, 1988) (unpublished Table Opinion) ("[A] plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."), *quoting Board of County Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). Notably, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

In order to prevail on a claim against a municipality for failure to train its

police officers in the use of force, a Plaintiff must first prove the training was in fact inadequate, and then satisfy the following requirements:

(1) the officers exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring situations with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the part of the city toward persons with whom the police officers come into contact, and (4) there is a direct causal link between the constitutional deprivation and the inadequate training.

*Carr v. Castle*, 337 F.3d 1221, 1228 (10th Cir. 2003).

As evidenced by the *Carr* factors listed above, "[a] municipality may not be held liable where there was no underlying constitutional violation by any of its officers." *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993) ("Our finding that Myer and White's conduct did not violate Hinton's Fourth Amendment rights, therefore, precludes the imposition of any liability against the City of Elwood."). Because this Court found (above) that there was no constitutional violation by Defendants Medina, LaFountain, Odom (all SPD officers), or McClure (an MCSO deputy), neither the City nor the Board may be held liable for failure to train or supervise, and therefore they are both entitled to summary judgment on Plaintiff's Third Cause of Action.

But even if there was an established violation of Ms. Schaapveld's constitutional rights, the Court finds that the City and Board would still be entitled to summary judgment. The Court assumes *arguendo* that the second requirement would be met here, in that the use of force as to Ms. Schaapveld arose in a typical circumstance such that officers can reasonably be expected to respond to regularly confront mentally ill individuals, even those who might resist apprehension. As to the third requirement regarding deliberate

indifference, however, the Court finds that Plaintiff has not met her burden. "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Connick*, 563 U.S. at 61.

In support of this third requirement, Plaintiff asserts in her response that here, as in *Allen*, "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of [both the City and the Board] can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). She asserts that the City had a complete lack of training of the SRT to be used as a tactical team, and that officers were trained that may use deadly force any time a person points a gun at them. She further asserts that the Board failed to train Deputy McClure on barricaded persons situations and in handling the mentally ill. In *Allen*, the Tenth Circuit found there was evidence that the actions of the officer in that case were "diametrically opposed to proper police procedures, out of synch with the rest of the police profession, and 'plain foolishness.'" *Allen*, 119 F.3d at 844. But here, the plaintiff has only provided assertions of training that Chief Shores or MCSO *should have provided*, which is distinguishable from *Allen*. *See, e. g.*, *King v. Glanz*, 2014 WL 2838035, at *6 (N.D. Okla. June 23, 2014) ("While *Allen* identified specific training which plaintiff's expert testified was 'out of synch with the entire United States in terms of

what police are being trained to do,' that is not so here. King and his expert rely on the *absence* of training that allegedly could have assisted them during their encounter with King. Moreover, unlike the expert in *Allen,* plaintiff's expert has opined that, had the deputies either contacted COPES (as authorized by the TCSO policy) or acted properly under the TCSO deadly force policy, it is likely that Mr. King would *not* have been shot. For these reasons, the Court finds that *Allen* is distinguishable on its specific evidentiary record."). Nor has Plaintiff demonstrated that "the need for more or different training [was] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390-391 ("That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program."). Plaintiff has provided no evidence in this case "that the [Defendants] had notice that there was any lack of training, or that the City consciously disregarded such notice." *Castenada v. City of Albequrque*, 276 F. Supp. 3d 1152, 1185 (D. N.M. 2016). *See also Carr*, 337 F.3d at 1229 ("[N]owhere do they show that the need for training was obvious to the city in the *City of Canton* sense."). And as the Tenth Circuit has held before, their "assertions merely demonstrate the omniscience of hindsight, rather than satisfying the demands of *City of Canton* and hence *Brown* [*v. Gray*, 227 F.3d 1278, 1288-1289 (10th Cir. 2000)." *Carr*, 337 F.3d at 1230. Accordingly, the City of Sulphur and the Board are both entitled to summary judgment as to the Plaintiff's Third Cause of Action regarding failure to train or supervise.

**42 U.S.C. § 1983 Claim for Supervisory Liability (Chief Shores).** Defendant Shores was the Chief of Police for the City of Sulphur at the time of the incident in question. As an initial matter, the Court notes that the Plaintiff, in her Complaint, named Defendant Shores "in his supervisory capacity," *see* "Complaint," Docket No. 2, p. 1. The claimant's Fourth Cause of Action, "Violation of 42 U.S.C. § 1983 for Supervisory Liability," is asserted solely against Defendant Shores and alleges that Defendant Shores "personally participated in the events" of this case, "gave the command to enter the building resulting in the use of deadly and unreasonable force against" Ms. Schaapveld, and "failed to intervene and prevent the unlawful and deadly use of force." *See* Docket No. 2, "Complaint," p. 19, ¶¶ 103-107. Defendant Shores asserts that the Plaintiff's supervisory liability claim must fail because she cannot establish that Defendant Shores acted with deliberate indifference, nor can she establish that there was an underlying constitutional violation. In her response, the Plaintiff contends that it was Defendant Shores who recklessly created the need for the use of deadly force in this encounter by ordering the entry into the building, creating *personal liability*, and that Defendant Shores is further liable as a supervisor.

"Section 1983 does not authorize liability under a theory of respondeat superior." *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011), *citing Monell v. Dep't of Social Services*, 436 U.S. 658, 691 (1978). "Because vicarious liability is inapplicable to []§ 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). The Tenth Circuit has interpreted this to mean that "§ 1983 allows a plaintiff

to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy" causing the constitutional harm. *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010). This means that two types of claims are contemplated: either personal liability through personal involvement *or* supervisory liability based on a violation of a policy. *Brown*, 662 F.3d at 1164-1165 ("Personal liability under § 1983 must be based on . . . personal involvement, and supervisory liability must be based on his Policy."). "In sum . . . plaintiffs here must establish that each defendant – whether by direct participation or by virtue of a policy of which he possesses supervisory responsibility – caused a violation of plaintiffs' clearly established constitutional rights, and that each defendant acted with the constitutionally requisite state of mind." *Pahls v. Thomas*, 718 F.3d 1210, 1228 (10th Cir. 2013).

Defendant Shores correctly notes that Plaintiff's response raises for the first time an allegation of personal liability of excessive force in violation of the Fourth Amendment as to Defendant Shores when she states that he is "independently responsible for excessive force under 42 U.S.C. § 1983." Docket No. 194, p. 21. Plaintiff's Second Cause of Action for excessive force specifically names Defendants Medina, LaFountain, Odom, and McClure but *does not name Defendant Shores* at any point. *See* Docket No. 2, pp. 14-16, ¶¶ 88-96. Furthermore, Plaintiff's Fourth Cause of Action, which *is* specifically directed at Defendant Shores, is only directed at him in the context of *supervisory liability* and contains no allegation of *personal liability* (only of personal participation) for excessive force. "The Court should not ordinarily consider a claim raised for the first time in a response brief." *Roberts v. Jones*, 2012 WL 1072218, at *1 n.1 (W.D. Okla. Feb. 29, 2012),

*citing, inter alia*, *Lawmaster v. Ward*, 125 F.3d 1341, 1346 n.2 (10th Cir. 1997) ("Because Mr. Lawmaster failed to raise the [claim], we refuse to consider it."*), and Fuqua,* 321 Fed. Appx. at 735 (affirming the refusal to consider a new claim in a response brief as a potential amendment when the plaintiff had failed to seek leave for an amendment or to provide notice of a request for further amendment). *See also Miller v. Cleveland County*, 2011 WL 2634190, at *4 (W.D. Okla. July 5, 2011) ("It is not until Plaintiff's response brief that he attempts to flesh out a claim for retaliation. However, Plaintiff has to date not requested leave to amend his Complaint. Accordingly, the Court declines to consider the retaliation claim on its merits."). The Court thus declines to consider Plaintiff's claim for personal liability as to Defendant Shores as it was raised for the first time in her response brief to Defendant's summary judgment motion and Plaintiff has failed to request leave to amend her Complaint.[2]

For purposes of supervisory liability, it is the Plaintiff's burden to demonstrate that "(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." *Dodds*, 614 F.3d at 1199-1200 ("Denying qualified immunity on the basis of such a showing complies with *Iqbal*'s requirement that § 1983 liability only be imposed upon those defendants whose own individual actions cause a constitutional deprivation because it requires plaintiffs prove each defendant took some act with the constitutionally

---

[2] The Court makes no judgment as to the viability of such a claim had it been properly raised.

applicable state of mind that caused the alleged constitutional violation.") (citation omitted).  The Tenth Circuit has distilled this further into "three elements required to establish a successful § 1983 claim against a defendant based on his or her supervisory responsibilities:  (1) personal involvement; (2) causation, and (2) state of mind."  *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 767 (10th Cir. 2013).  What is required is that the "plaintiff must plead that *each* Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Id.* at 768 (emphasis added), *quoting Iqbal*, 556 U.S. at 676.  To establish personal involvement for supervisory liability, while "'direct participation' is not 'necessary' to satisfy this element, surely is it sufficient."  *Estate of Booker v. Gomez*, 745 F.3d 405, 435 (10th Cir. 2014), *quoting Pahls*, 718 F.3d at 1225.  The element is easily established as to Defendant Shores, given his presence at and command of the scene as Chief of Police for the City of Sulphur, as well as his responsibility for the continued operation of Department policies.  This claim, then, turns on the next two factors, *i. e.*, whether he caused the complained-of constitutional harm and did so with the requisite state of mind.

As to causation, the Plaintiff is required "to show that the defendant's alleged action(s) caused the constitutional violation" by "set[ting] in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights."  *Schneider*, 717 F.3d at 768, *quoting Dodds*, 614 F.3d at 1200.  Based on this Court's analysis of the Plaintiff's second cause of action (above), there is no underlying constitutional violation.  Absent such a basis, the Plaintiff has therefore failed to establish a supervisory liability claim.  *Fogarty*, 523 F.3d at 1162

("[S]upervisors may be liable for a subordinate's constitutional deprivations under certain circumstances."). *See also Christensen v. Big Horn County Board of County Commissioners*, 374 Fed. Appx. 821, 827 (10th Cir. 2010) ("[I]n light of the inadequacy of the underlying constitutional allegations against the actual participants—which we confirm on this appeal—there is nothing for which these defendants may be held derivatively accountable."); *Martinez*, 563 F.3d at 1091-1092 ("Likewise, Beggs cannot be held liable in his individual capacity for implementing county policies or for the actions of county officers under a theory of supervisory liability, when there was no violation of Ginn's constitutional rights."); *Bruner-McMahon v. Hinshaw*, 846 F. Supp. 2d 1177, 1207 (D. Kan. 2012) ("Absent an underlying constitutional violation, plaintiffs cannot assert a supervisory claim."); *Ruegsegger v. Jefferson County Bd. of County Commissioners*, 197 F. Supp. 2d 1247, 1259 (D. Colo. 2001) ("Based on the analysis of Claims One, Two, and Four [] Plaintiffs have not made an initial showing of an underlying constitutional violation on the part of the responding Sheriff Defendants. Thus, Plaintiffs have not met the second essential element of a supervisory liability claim.").

But even if the officers *did* commit a constitutional violation in firing their weapons at Ms. Schaapveld, the Court nevertheless finds that Defendant Shores should not be held liable as a supervisor because the causation element cannot be sufficiently established here. The Court has some reservations about Chief Shores' judgment in handling a mentally ill individual and his call to end negotiations at the time that he did, particularly after his abrupt treatment of her had already previously stalled negotiations. However, there is no indication that he instructed the officers to fire their weapons at Ms. Schaapveld, and thus

no *causal* connection between the *decision to apprehend* Ms. Schaapveld and the ultimate *use of deadly force*. *See, e. g.*, *Smith v. LePage*, 2015 WL 13260394, at *21 (N.D. Ga. Mar. 31, 2015) ("While the Court believes Sergeant Gamble made a tragic mistake of judgment in not calling in a SWAT team trained in negotiations under these types of circumstances, there is no indication that Gamble expressly directed any officer to fire his gun at Dirk Smith and there is no basis from which a jury could reasonably infer a causal connection between his direct participation in the decision to apprehend Mr. Smith by force and his officers' ultimate use of deadly force.), *citing Cottone v. Jenne*, 326 F.3d 1352, 1360-1361 (11th Cir. 2003) (holding that supervisory liability under § 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation such as when facts support an inference that the supervisor directed his subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so). Accordingly, the Court finds that Defendant Shores is entitled to qualified immunity on Plaintiff's Fourth Cause of Action.

## CONCLUSION

In summary, the Defendant Board's Motion and Brief for Summary Judgment [Docket No. 174]; Defendant Jay McClure's Motion and Brief for Summary Judgment [Docket No. 175]; Defendants City of Sulphur, David Shores, Jack LaFountain, Veronica Medina, and William Odoms' Motion for Summary Judgment and Brief in Support [Docket No. 179]; and Defendant Oklahoma Department of Public Safety's Motion for Summary Judgment and Brief in Support [Docket No. 183] are hereby GRANTED.

DATED this 16th day of December, 2019.

Steven P. Shreder
United States Magistrate Judge
Eastern District of Oklahoma